Good afternoon, Your Honors, and may it please the Court. My name is Hyde Calvin. I have the honor of representing Arabian Support & Services Company, the appellant in this matter. I would respectfully request one minute for rebuttal. The appellee here wants you to believe that this is a simple case. In fact, it is not. While trying to hide behind an integration clause in the consulting agreement and saying that it's dispositive, their own 30B6 witness testified in deposition. Last year, that there was a separate agreement, a separate offset services agreement between ASASCO and Textron. The integration clause at issue here, the one that is in the consulting agreement, which we will submit, does not apply to the separate offset services agreement. States, in relevant part, and I think it's worth quoting here, quote, this agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements or understandings written and oral. The pivotal language, we would argue, is the subject matter hereof. That is the subject matter of the consulting agreement. Representations made about the offset services agreement, that separate agreement, fall outside the subject matter hereof. Now, in looking at our chapter 93A claim, which was count three of the complaint. But before you get to that, so how would you characterize the duties and responsibilities of the two contracts if they were intended to cover different subject matter? Well, Judge Thompson. I'm sorry, as far as performance. I understand. And let me try to answer your question. The consulting agreement imposed an obligation on ASASCO to assist Textron with marketing the SFW in Saudi Arabia, to assist it with local knowledge, to assist it with the various ministries in Saudi Arabia that were involved in the decision making process, to do the various visas, the custom clearances, perhaps, for any products that were shipped to Saudi Arabia for demonstration purposes. That's what ASASCO was duty bound to do under the consulting agreement. Excuse me. I thought both the consulting agreement and the offset agreement both related to securing a contract with the Saudi Arabian government. The consulting agreement wasn't just about marketing. I thought it was an attempt to secure, again, the contract. Isn't that so? Well, yes, the consulting agreement imposed an obligation on ASASCO as the consultant to try to assist Textron with regard to marketing its products. The offset services agreement comes later. The offset services agreement foresees that the Saudis have bought this weapons system and have imposed an obligation on Textron to have these offset requirements. In other words, to invest some of the contract value back into the Saudi economy. So we're talking about two separate agreements. You seem to say there was an oral agreement as to offset. In fact, there was a separate offset agreement which is written. I don't understand what it is you're arguing here. Let me try to clarify. We've argued that there was a written offset services agreement and that we were the third party beneficiary, essentially, of the agreement between Textron and Blenheim. Textron brought Blenheim into the picture. Are you making an independent claim that there was nonetheless an oral agreement between Textron and your client as to offset activity? Well, there's... Yes or no? You can answer that. I'm making that argument however you want. No, you wait a minute. If Judge Lopez, if your answer to Judge Lopez is yes, the initial agreement included securing a contract, how could there be an oral separate contract then as to offset, then the Blenheim-Textron? Well, there was an agreement between Blenheim and Asasco for Asasco to perform, and that was a written agreement, for Asasco to perform certain offset services for the ultimate benefit of Textron. That is a written agreement. There are multiple emails here from Textron representatives to Asasco in which they basically say that offset services agreement is a separate agreement. In fact, in 2006, an internal Textron email essentially said that we're going to keep separate books for the offset services agreement with Asasco and a separate set of books for the consulting contract. You're arguing a third one. What is this third offset agreement that you're arguing? I'm arguing that there was one offset services agreement. It was basically in two steps. First, you had an agreement that was signed in February of 2008 between Textron and Blenheim for Blenheim to provide Textron with offset services. That agreement references your client in only one provision, and that provision acknowledges that Blenheim can engage your client as a subcontractor. There is nothing in that agreement which indicates in any way that Textron has any obligation to compensate your client in any way. Is that not correct? I think there is language in that agreement that says that it's optional to go with Blenheim. It wasn't a requirement that it was at Blenheim's option. However, that ignores the fact that Textron was involved in all of the meetings between Blenheim and Asasco. They encouraged those meetings. They participated in them. When the negotiations between Asasco and Blenheim broke down, Textron got involved to give the parties momentum. That's all part of the record. So you have this labor contract in April of 2008 between Blenheim and your client, which does set forth some very specific payment terms. It refers to an escrow agreement. It specifies the conditions under which your client will be paid. But that agreement makes no reference to Textron at all, suggesting, prompting Judge Stern to say, your dispute is with Blenheim, not Textron. So how do those specific payment terms set forth in that Blenheim-Arabian support agreement, how are those imputable to Textron? Well, Blenheim was Textron's brainchild. They're the ones that brought Blenheim to the table. The record is replete with multiple emails. So you're talking about those Bulganian emails, which apparently take place between the execution of the agreement between Textron and Blenheim and then the agreement between Blenheim and Arabian support. What principle of law permits you to rely upon those kinds of oral representations and communications? Well, they were oral and they were also in emails. These were misrepresentations made by Textron's man in the Middle East, the person tasked with marketing Textron products in Saudi Arabia. How would you answer the question? Well, there were multiple misrepresentations, which certainly gave rise to a 93-A claim, starting before Textron and Blenheim signed their agreement. There were email communications in 2006. You've got a breach of contract theory, you've got a 93-A theory, and you've got a third-party beneficiary theory. Judge Lopez's question, I believe, goes to all three of your theories. And even if you lose on your contract and your third-party beneficiary, do you have any 93-A claim left? Absolutely. We have basically out-and-out laws. An integration clause in a contract? Absolutely. You said that you wanted to plead fraud in the inducement. If we were allowed to amend the complaint. Right, if you were allowed to amend. Isn't that your strongest argument for these emails? Well, I think it's axiomatic that a Chapter 93-A claim can stand on fraudulent misrepresentation. And we have multiple misrepresentations that were made to SASCO, starting from the- Okay, your time is up. Thank you. Thank you. Can I just ask one more question? Yes. Judge Thompson has a question. Just one more question. Sure. Is SASCO a family business or something? Or is it a large corporation? It's not a family business. It's a small-to-medium-sized corporation, maybe 15 to 20 employees, I believe. I guess we're just trying to figure out why they couldn't write better contracts, to protect themselves. Well, the contracts were all text-formed agreements. They drafted these agreements. They drafted them, and you guys signed them. Well, and SASCO relied on Mr. Baranian's various misrepresentations, and others, like Mr. Harrington, and others at SASCO. Judge Flip has also has a question. Just for you to think about, you can respond to this in your rebuttal. Sure, please. You seek to amend your complaint to allege fraud in the inducement, suggesting that you found things out in discovery that you did not otherwise know. For that fraud in the inducement claim, you relied a lot on these Baranian emails. But the record indicates that your client had copies of those emails even before this complaint was filed. So this is for your rebuttal if you can respond to it. I'm interested in knowing why you were not able, given that you have these emails that are so important to you, why you could not include in your allegations this fraud in the inducement claim, if you could respond to that in rebuttal. I'd appreciate it. Thank you, Judge. Thank you. Thank you. Good afternoon, Your Honors. Edwin Yu, Kirkland Analyst for Textron Systems. A SASCO's own summary judgment brief told the district court that the contract between TSC and Blenheim and the contract between Blenheim and a SASCO, quote, established exactly the contract terms that a SASCO alleges it was promised. That's in the joint appendix at 1090 and time 91. Those are a SASCO's words, not mine, and they show exactly why the district court was correct in disposing of the claims that were actually presented below. First, a SASCO brought a third-party beneficiary claim under the contract between TSC and Blenheim, but nothing in that agreement elevated a SASCO to the status of clearly and definitely being a third-party beneficiary, as cases like Cooper from this circuit made clear. The contract did not require work to be given to a SASCO. It did not require payments to be made to a SASCO. All it says, the only reference to a SASCO, is in the assignment provision of the contract that says that a SASCO, quote, may be used as a subcontract. The premise of the preamble in your point cites Blackwater Law for the proposition that the third-party beneficiary can be established in the language of the agreement and circumstances related to the execution of the agreement. I understand their claim is that the district court did not consider, did not allow them to establish the circumstances that would establish their third-party claim. The district court looked only at the language of the agreement. That was too narrow a view, but the law permitted them to argue in support of their third-party beneficiary claim. Your Honor, there was no need for the district court to do that, even if the request had been made, because cases like Cooper, Kronmeier from the Ninth Circuit, Harper from the Seventh Circuit, and others make clear that even when the plaintiff is expressly referred to by name in the contract, that's still not enough to give it an exception of the usual rule that a third-party cannot sue under the contract directly. And what's more, even if a SASCO had been a third-party beneficiary under the contract, the independent deficiency with that cause of action was that there was no showing of any breach of that contract between TSC and Blenheim. And Your Honor hit the nail right on the head. There was nothing in the agreement requiring an escrow account. There was nothing in the agreement requiring TSC to make payments to a SASCO. Those provisions appear only in the contract between Blenheim and a SASCO, to which TSC was never a party. What I'm claiming here is that the subsequent agreement between Blenheim and Arabian Support, excuse me, seems to be entirely consistent with the representations made by Mr. Boyavian in those emails, where he actually describes Blenheim as the agent of Textron, suggesting that Blenheim, in entering into that agreement with Arabian Support, was doing so on behalf of Textron, and the payment arrangements that are set forth in that agreement between Blenheim and Arabian Support are the payment terms that Textron had in mind. So, Your Honor, the Boyavian emails were, at a point in time in his deposition testimony, referred to questioning about a deposition exhibit that was a draft of a contract that would have been directly between a SASCO and TSC. It's undisputed that was never signed and never implemented. What the parties instead had was for TSC to contract with Blenheim, and for Blenheim to contract with the SASCO. And again, the reference to an escrow provision and the reference to paying a SASCO appears nowhere in the contract to which TSC is a party. And that's why a SASCO was forced to pursue, at best, a third-party beneficiary claim. But it can't show that it clearly and definitely was a third-party beneficiary. The second cause of action it issued before the district court was for tortious interference between the contract between Blenheim and a SASCO. But the problem here is that there was nothing to show any breach by Blenheim as a tortious interference claim would require. And that's because the Blenheim-a-SASCO contract stated that it would end automatically upon the end of the contract between TSC and Blenheim. There was nothing tortious about the fact that it came to an end. It came to an end, that is, the contract between Blenheim and a SASCO, pursuant to the very expiration provision that a SASCO freely signed up to. And indeed, a SASCO's entire premise is that it is a sophisticated representative of American defense contractors. It made a point of saying that it was experienced, having had previous representations of companies like Lockheed Martin and Thompson CSF. So we then go to the Chapter 93A claim, which was the only other cause of action actually brought. And the problem here is that nothing required TSC to renew its consulting contract with a SASCO. That contract had a one-year term from year to year. And cases like Boston Flower Exchange established that there was no obligation to renew a contract when the contract imposes no obligation to renew it. You sort of have this odd circumstance that that consulting agreement describes diminishing consultant fees that reduce to zero, and yet Arabian Support continues to provide services for Textron. Their argument is, yeah, they continue to provide those services because they understood that they were going to be compensated through this arrangement that is described in the Blenheim-Arabian Support agreement. Why would they continue to work for nothing? So, Your Honor, what the record showed is that the contract provided for $10,000 a month at times, at a time when Textron Systems was reducing its worldwide use of the consultants, the compensation was reduced to $500 a month, and in some months to zero, with no objection by a SASCO. Well, they did it because they knew they were going to be compensated otherwise. Yes, Your Honor, and if that's their current theory, that the prospect of offset work down the road was the inducement for them to continue the consulting services under the consulting agreement, then they run directly into the entire compensation provision in the consulting agreement, if I could explain. If their theory is that offset work was the inducement to go under the consulting agreement and continue within it, you run directly into the language that a SASCO did not read in its argument today. The consulting contract between TSC and a SASCO says it is expressly agreed that, quote, any and all services rendered by a SASCO to TSC shall be deemed to have been given pursuant to this agreement. That's first. And second, that no additional payments, except for reimbursing expenses, no additional payments shall be due or paid to a SASCO. And that makes sense precisely as American companies doing business abroad want the contractual certainty of specifying what obligations and what monetary obligations do or don't exist when lining up a consultant abroad for a potential sale. And that falls in the heartland of this Court's decision in HSBC. And what the Court observed in that case, like in this case, is that reliance on supposed misrepresentations that contradict the terms of the parties' agreement is unreasonable as a matter of law and so cannot support a fraudulent inducement claim. That's very different from the Kenda case that a SASCO relies on, because in Kenda the contract was silent on the subject at hand, whereas here a SASCO and TSC expressly disclaimed that there would be the additional compensation. What's the interest of the doctrine of fraudulent inducement if you're saying that the language of a contract says one thing, the party says, well, yes, it said that, but we were induced to agree to that only because of certain representations were made to us as to how it might be applied or we had some other agreement? It seems to me that reliance to eliminate the doctrine of fraudulent inducement because of explicit contract language leaves no play for the doctrine. Not at all, Your Honor. And as Judge Selya might say, the rule of decision here is between HSBC on one hand and Kenda on another, because in HSBC, like here, the contract expressly covers the subject at hand. It expressly precludes exactly what a SASCO is seeking. So unlike in Kenda, where the contract is silent on the subject and opens the door to more, perhaps, here two sophisticated commercial entities expressly agreed that any and all services from a SASCO would be deemed pursuant to this agreement and that no additional payments would be due. And that's on top of the independent problem, Your Honors, that there was no fraud or fraudulent inducement claim actually brought. And let me close on that point. The motion to dismiss opposition stated that plaintiff, quote, previously refrained from asserting these claims, mindful of its obligations under Rule 9b. Their words, not mine. By the time we got to summary judgment, a SASCO told the district court that it, quote, has not filed a motion to amend and the plaintiff is happy to take guidance from the district court. But that's not how motions go. A movement has to state with particularity what it's seeking so the district court can give a thumbs up or thumbs down. Thank you, Your Honors. You have a minute, Counsel. May I address Judge Lopez's earlier question? What we learned in discovery that would support an amendment, I think, was the gist of the question. I think we got confirmation by Textron's 36th designee that they viewed these as two separate agreements, the consulting agreement and the offset services agreement. That confirmation was critical. The other thing that we didn't have until this litigation commenced was the termination agreement, Textron's termination agreement to Blenheim.  And in that agreement, it seems to refer to a January 2011 agreement between Textron and Blenheim called the offset framework services agreement, which SASCO knew nothing about and which was clearly indicated in the termination letter. If I may address. 30 seconds. Cooper is not on point here. Cooper dealt with a government contract and basically said that members of the public can't be third-party beneficiaries of a government contract. HSBC versus O'Neill is an opposite. These facts fit snugly into the McEvoy case that we cited in our papers. Thank you very much, Your Honors.